# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America<br>v.<br><br>CARLOS A. GARCIA<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>) | Case No. 11-3215-PRP |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  October 1, 2006 to July 31, 2009  in the county of  Miami-Dade  in the  Southern  District of  Florida , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 545 | by knowingly receiving, purchasing, selling, and distributing approximately 229,718 kilograms of R-22 after importation, knowing the same to have been imported or brought into the United States contrary to the Clean Air Act, in violation of 18 U.S.C. § 545. |

This criminal complaint is based on these facts:
See Attached Affiavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Oswaldo Romero, Jr., Special Agent, EPA/CID
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  09/09/2011 

_____
*Judge's signature*

City and state:  Miami, Florida   PETER R. PALERMO, U.S. MAGISTRATE JUDGE
*Printed name and title*

# AFFIDAVIT

I, Oswaldo Romero Jr., being duly sworn, depose and state the following:

1. I am a Special Agent for the United States Environmental Protection Agency – Criminal Investigation Division (EPA-CID) and have been so employed in that capacity for approximately ten years and six months. I am currently assigned to investigate potential violations of federal environmental statutes and related offenses. Prior to my employment with EPA-CID, I was employed as a Special Agent for the United States Department of Transportation (DOT), Office of Inspector General (OIG) for approximately three years and four months. Prior to my employment with DOT-OIG, I was employed as a Federal Probation Officer for more than five years. As a Special Agent with EPA-CID, I am responsible for investigating violations of the federal Clean Air Act laws, including Title 42, United States Code, Section 7413(c)(1).

2. This affidavit is not intended to include each and every fact discovered by your affiant during the course of this investigation. Instead, it is intended to demonstrate that there is probable cause to believe that Carlos A. Garcia knowingly received, purchased, sold, and distributed merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law, that is: approximately 229,718 kilograms of hydrochlorofluorocarbon 22, also known as HCFC-22 or R-22 (hereinafter "R-22"), which Garcia knew had been imported and brought into the United States contrary to the Clean Air Act, all in violation of 18 U.S.C. § 545.

## BACKGROUND INFORMATION

3. The purpose of the Clean Air Act (CAA) is, among other things, "to protect public health and welfare from any actual or potential adverse effect which in the EPA Administrator's judgment may reasonably be anticipated to occur from air pollution or from exposures to pollutants in other

1

media..." and "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7470 and 7401(b)(1).

4. Chlorofluorocarbons (CFCs), HCFCs, halons, and other ozone depleting substances (ODSs) are regulated under an international treaty, the Montreal Protocol on Substances that Deplete the Ozone Layer, a Protocol to the Vienna Convention for the Protection of the Ozone Layer. The Montreal Protocol was implemented in the United States by Title VI of the CAA, 42 U.S.C. §§ 7671-7671q, and by the Stratospheric Ozone Protection regulations promulgated by the EPA, 40 C.F.R. Part 82. ODSs were widely used by industry and private consumers until their destructive effect on the ozone layer was recognized. The stratospheric ozone layer is an important shield against the harmful effects of ultraviolet radiation.

5. The CAA and its implementing regulations established a schedule to phase out ODS production and importation. The CAA divides ODSs into two classes, depending upon the degree of harm to the ozone layer. See 40 C.F.R. Part 82, Subpart A, Appendices A and B. Class I controlled substances include CFCs and halons. Most Class I ODSs were phased out as of January 1, 1996. After that date, production or importation of CFCs and halons was generally prohibited. Class II ODSs are the HCFCs and are scheduled for phase-out between 2003 and 2030.

6. The Montreal Protocol required the United States to reduce its consumption of ODSs by 35 percent below the baseline cap by January 1, 2004. To meet its commitment, the United States took several steps which included issuing baseline allowances for production and import of R-22. R-22, has been the refrigerant of choice for residential heat pump and air-conditioning systems for more than four decades. The EPA allocated 100 percent of the United States consumption and production

allowances to individual companies. Effective January 21, 2003, EPA further restricted the import of bulk quantities of R-22 to only those persons holding unexpended R-22 consumption allowances. The ODS phase-out schedule specifically addressing the Class II ODS is found in 40 C.F.R. § 82.16. Persons that hold baseline consumption allowances to import R-22 are listed in 40 C.F.R. § 82.19.

7. The CAA prescribes criminal penalties for any person who knowingly violates the provisions relating to stratospheric ozone control, including violating the requirements of any rule, order, waiver, or permit promulgated or approved under such sections or subchapters. 42 U.S.C. § 7413(c)(1). Subchapter VI, codified at 42 U.S.C. § 7671, et seq., authorizes the Administrator of the EPA to promulgate regulations governing the handling of ODSs. Persons convicted of violating this section shall be punished by a fine pursuant to Title 18, or by imprisonment up to five years, or both. Generally, persons may be prosecuted for knowingly violating the importation controls of Subchapter VI, in particular 42 U.S.C. §7671d and 40 C.F.R. § 82.15.

8. In addition, the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE) is tasked with investigating and enforcing U.S. import statutes such as 18 U.S.C. § 545, which prohibits a person from importing any merchandise "contrary to law" and prescribes a criminal penalty against any person who "receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the Untied States contrary to law."

## HISTORY OF INVESTIGATION

9. Mar-Cone Appliance Parts Co. (hereinafter "Marcone") is a Missouri corporation serving customers in the appliance parts market throughout the United States. In approximately 2005, Marcone changed its name to Marcone Supply and began the sale of heating, ventilation and air

3

conditioning (hereinafter "HVAC") equipment, parts, and supplies. In 2008, Marcone formally named its Miami subsidiary Marcone Heating and Cooling to better position it in the HVAC market. Carlos A. Garcia (hereinafter "Garcia"), a former employee, returned to Marcone in 2001 after several years running his own company and was subsequently named the Vice-President of Global Sales for the Miami office. In an interview on August 13, 2009 with EPA-CID and ICE agents, Garcia indicated he had over 30 years of experience in the HVAC business. During the interview, Garcia demonstrated an awareness of the EPA regulations governing the importation of R-22, specifically the regulatory structure of allowances, which he referred to as quotas, and was able to list some of the local companies which hold the allowances, such as Refricenter and Saez Distributors, both holders of consumption allowances and listed in 40 C.F.R. § 82.19.

10. According to Marcone's corporate executives, Garcia's role in export operations included the purchasing of merchandise for export, but he also became involved in the purchasing of R-22 for the HVAC division's domestic sales. According to Marcone executives, Garcia was given authority to procure sources of R-22 and engage in negotiations for its purchase after he developed several sources that had very competitive prices.

11. In July 2007, EPA-CID and ICE began investigating the illegal importation of R-22 by a Miami Beach based company, Lateral Investments LLC (hereinafter "Lateral"). This investigation lead to the discovery of approximately 55,838 cylinders [759,397 kg] of R-22 illegally imported into the United States from China between January 20, 2006 and August 5, 2007. Through a review of all records related to this investigation as well as interviews with Lateral Investments' principal owner, it was determined that a large number of the R-22 cylinders were sold to Marcone. All of the cylinders imported by Lateral were Chinese in origin. According to EPA's Stratospheric Protection

Division, Lateral did not hold the baseline consumption allowances necessary to import R-22 into the United States. On July 29, 2011, Brendan Clery, the principal owner of Lateral was sentenced in the Southern District of Florida to an 18 month term of incarceration for his role in the smuggling of the R-22 into the United States.

12. A separate investigation of illegally imported R-22 initiated in December 2008 involved a Miami company known as Southern Electric Motors (hereinafter "SEM"). This investigation involved the importation of two shipping containers of R-22 containing approximately 1,697 cylinders [31,030 kg] of R-22 illegally imported into the United States from the Dominican Republic on October 21, 2008 and December 2, 2008, respectively. Through a review of all records related to this investigation, as well as interviews with SEM's owners, it was determined that 400 cylinders were sold to Marcone on or about November 11, 2008. All of the cylinders sold to Marcone were Chinese in origin. According to EPA's Stratospheric Protection Division, SEM did not hold the baseline consumption allowances necessary to import R-22 into the United States. On December 29, 2010, the two principal owners of SEM and two other individuals involved in the smuggling operation were sentenced in the Southern District of Florida for their roles in the smuggling of R-22 into the United States.

13. A third investigation of illegally imported R-22 initiated in March 2009 involved another company in the Miami area known as Kroy Corporation (hereinafter "Kroy"). The investigation lead to the discovery of approximately 29,107 cylinders [418,654 kg] of mostly R-22 illegally imported into the United States from the Dominican Republic from March 19, 2007 through April 30, 2009. Through a review of all records related to this investigation as well as interviews with Kroy's owner, it was determined that a large number of the R-22 cylinders were sold to Marcone. A review of Kroy

5

importation records show that some of the cylinders sold to Marcone were from manufacturers based in the United States, while others were clearly Chinese in origin. According to EPA's Stratospheric Protection Division, Kroy did not hold any baseline consumption allowances. On February 11, 2010, James Garrido, the owner of Kroy, was sentenced in the Southern District of Florida for his role in the smuggling of R-22 into the United States.

14. On March 18, 2010, Marcone pled guilty and was sentenced in the Southern District of Florida for the illegal receipt, purchase, and sale of smuggled R-22 from Lateral, SEM and Kroy.

## OFFENSE CONDUCT

15. An undercover operation involving a cooperating witness (hereinafter "CW") was established to document Garcia's involvement in the purchase and distribution of R-22. This operation culminated in a controlled delivery of R-22 to Marcone on August 13, 2009. As part of the operation, Garcia met with the CW on July 21, 2009 and accepted a payment of $5,120 in cash from the CW, which represented a kick-back of $4 a cylinder from an earlier sale of 1,280 cylinders on May 13, 2009 by Kroy. During this meeting, Garcia can be heard discussing with the CW a recent Marcone purchase of reclaimed R-22 from a company called Harp, later identified as Harp USA (hereafter "Harp"). Garcia advised the CW that as far as he knew, Harp did not have permission to import the R-22. When asked how Harp sold him the R-22, Garcia stated (translated from Spanish) "God knows how they went about it. Remember that there are a bunch of tricks...." Garcia further stated that he was thinking about it the day before and asked himself how did they do it. Garcia speculated that perhaps Harp sold the R-22 to a company that had a "license", such as Refricenter, and they imported it and then invoiced it back to Harp. He reiterated to the CW, that Harp couldn't import it. During this conversation, Garcia explained that there are basically three companies in the area that

had a "license," naming Refricenter, Saez, and H.G. Refrigeration. In fact, in 2009 the EPA's Stratospheric Protection Division granted a petition by Harp for a single importation of reclaimed R-22, as authorized by the CAA.

16. In a telephone conversation on July 30, 2009, the CW advised Garcia that there would be 25 pallets of R-22 arriving the next day. The CW told Garcia that the shipment should leave Customs in a day or two and that the CW would call Garcia when it was ready. During the conversation, Garcia asked if the R-22 was one of two domestic brands and the CW told him that the R-22 was of Chinese origin. Garcia responded "No problem. Okay."

17. On August 13, 2009, the CW and Garcia coordinated the delivery of the 25 pallets of R-22 to Marcone. Garcia agreed to send a truck to pick up the pallets and to give the CW a check for the merchandise. The CW advised Garcia he intended to visit the Marcone store immediately after the truck picked up the merchandise to pick up the payment check in order to deposit it and return with Garcia's portion of the deal before the CW left for the Dominican Republic to arrange another shipment. Thereafter, a truck picked up the 25 pallets of R-22. The CW then drove to Garcia's office at Marcone arriving at approximately 12:05 pm and picked up check 144096 from Marcone's corporate headquarters, dated August 10, 2009 in the amount of $128,000 and made out to Kroy. The CW told Garcia that he was on his way to the bank and left the office at approximately 12:10 pm. Instead, the CW was escorted to the ICE Office by task force personnel, arriving at 12:17 pm.

18. The truck transporting the R-22 to Marcone was intercepted and your affiant and ICE Special Agent Giddel Casadesus made contact with Garcia at about 12:30 pm, approximately twenty minutes after the CW left Garcia's office.

19. During the interview, Garcia acknowledged knowing the CW and purchasing R-22 from Kroy a couple of times. He denied any knowledge of where the CW purchased the R-22, including whether or not the CW imported the refrigerant. Garcia further stated that he rarely questions where the refrigerant comes from or whether or not it is imported. Garcia was then notified that the R-22 was being held pending further investigation.

20. Garcia claimed that he had seen a report about a year earlier listing the companies that could import R-22. He stated that the quotas are listed in pounds and regulated every year. According to Garcia, Marcone looked into getting approval to import R-22 and was told that unless they already had quotas from a certain date they could not import R-22. Garcia also stated that Marcone purchased a lot of R-22, mostly domestic brands that do not spark much suspicion about improper importations because they are manufactured in the United States. Garcia denied purchasing any Chinese or foreign brand R-22 from Kroy. When questioned about which companies Marcone had purchased R-22 from in the past three years, Garcia provided the names of four companies including Kroy, but did not mention Lateral or SEM.

21. Garcia stated that the CW usually called to ask if he needed any refrigerant. He claimed the CW never said whether he was licensed to import the R-22, but Garcia stated he would not have asked because the CW had only sold Marcone U.S. brands of R-22. Garcia further stated that if the CW had sold or offered to sell Marcone Chinese R-22, then Garcia would have probably asked where the CW was getting it from. Garcia stated that he did not know what brand of R-22 was in the shipment that the CW was delivering that day.

22. Garcia asserted that he would not release a check for the refrigerant until the goods were delivered. Garcia stated that when he received an invoice from the CW, he would send the

8

information to the corporate headquarters and they would send back a check via UPS. Garcia also stated that all refrigerants purchased by Marcone were purchased through the Miami store because the prices were generally cheaper.

23. Garcia claimed that he had not spoken with the CW since August 3, 2009 and that he had left specific instructions not to provide the CW the check for the R-22 until the company had an opportunity to inspect the merchandise. Garcia indicated that in the current transaction, the check was supposed to be hand-delivered to the CW by a counter person at Marcone. Garcia stated that he had told the CW that he was on vacation and would not return until that day so Garcia anticipated the CW would call him before coming by to pick up the check.

24. Garcia was asked to assist by notifying your affiant when the CW called to pick up the check and advised not to alert the CW to the investigation so that the agents could catch the CW with the check for the R-22 in the CW's possession when leaving Marcone.

25. Garcia's interview on August 13, 2009 was terminated at approximately 1:23 pm. At approximately 1:41 pm, Garcia called your affiant to report that the CW had just come by the office unannounced and picked up the check. At the time that your affiant received the phone call from Garcia at approximately 1:41 pm, your affiant was meeting with the CW at the ICE Miami office. The CW had been in the ICE office under constant supervision since arriving at approximately 12:17 pm.

26. At approximately 2:03 pm on August 13, the CW initiated a phone call to Garcia and advised him that the CW was on his way back to Marcone in order to give Garcia his money. Garcia told the CW to hold off and not to do anything then. Five minutes later, at approximately 2:08 pm, Garcia called your affiant to confirm that Marcone had placed a stop payment on the check.

27. On August 19, 2009, your affiant and ICE Special Agent Giddel Casadesus interviewed Garcia again at Marcone's Miami office. Garcia was initially warned about the potential consequences of providing federal agents with false information and cautioned that agents had been monitoring every phase of the shipment on August 13, 2009. Garcia subsequently admitted that he was not truthful about giving the CW the check because he panicked. Garcia stated that the "mere fact we are doing something wrong as a company" got him scared and he realized that they could get in trouble for doing business with the CW. During the course of the interview, Garcia denied receiving any kick-backs or cash from the CW, instead claiming that the CW had offered him money on several occasions but Garcia would not accept it. After being confronted with the fact that the CW had told your affiant that the CW was paying Garcia $4 a cylinder, Garcia again denied the claim and insisted he had been offered $5 a cylinder and turned the CW down, telling the CW on August 13, 2009 that he did not want the money.

28. After your affiant confronted Garcia with the CW's withdrawal of $5,120 corresponding to $4 a cylinder for the 1,280 cylinders of R-22 that Kroy had sold to Marcone in early May 2009, Garcia admitted that he had taken the money from the CW. Garcia denied raising the price of the R-22 so that the CW would pay him. Garcia indicated that the CW was selling him the R-22 for $128 a cylinder and Marcone was purchasing it from others for $138 to $141 a cylinder. Garcia subsequently stated that he had been receiving approximately $1 a cylinder from Lateral for every cylinder that Marcone purchased from them. Garcia stated that Marcone was paying the CW much less than they were accustomed to paying for R-22 and "the company was making a lot of money off refrigerant."

29. Garcia explained that he began purchasing the R-22 from Lateral when he was contacted "out of the blue" by an individual named Jorge Murillo (hereinafter "Murillo") from Peru. Garcia stated he had known Murillo for many years, but had not spoken to him in seven to eight years. According to Garcia, Murillo told him he had a company in Miami with another individual for about two years. Garcia later identified that company as Lateral. According to Garcia, Murillo told him he had quotas to sell R-22 in the past and that they were still valid, despite the fact that Murillo had his business back in the mid 1990's and the regulations regarding R-22 did not become effective until much later. Garcia indicated he did not verify if Murillo's company had any quotas to import R-22.

30. A review of Marcone purchase records and corporate emails indicate that Garcia, acting in his capacity as Vice President of Marcone, initiated the purchase of R-22 from Lateral on eleven occasions, from October 4, 2006 through August 7, 2007, totaling 12,417 cylinders [168,870 kg] of R-22 with a fair market value of $922,419. Lateral never held the unexpended consumption allowances necessary to legally import R-22.

31. Marcone purchase records indicate that on or about November 11, 2008, Garcia initiated the purchase of 400 cylinders [5,440 kg] of R-22 from SEM. The R-22 had a fair market value of $66,320. SEM did not hold unexpended consumption allowances necessary to legally import R-22.

32. In addition, Marcone purchase records and corporate emails indicate that Garcia initiated the purchase of R-22 on six occasions from Kroy, from February 4, 2009 through July 31, 2009 totaling 4,080 cylinders [55,408 kg] of R-22, with a fair market value of $482,728. Kroy did not hold unexpended consumption allowances necessary to legally import R-22.

33. Based on the foregoing, your affiant has probable cause to believe that Carlos A. Garcia knowingly received, purchased, sold, and distributed approximately 229,718 kilograms of R-22 after

importation, knowing the same to have been imported or brought into the United States contrary to the Clean Air Act, in violation of 18 U.S.C. § 545.

FURTHER AFFIANT SAYETH NAUGHT.

Oswaldo Romero, Jr., Special Agent
U.S. Environmental Protection Agency
Criminal Investigation Division

Sworn and subscribed to before me this __9TH__ day of September, 2011, at Miami, Florida.

PETER R. PALERMO
UNITED STATES MAGISTRATE JUDGE